Michael C. Manning (#016255)
William P. French (#001765)
Christopher J. Berry (#015385)
**MORRISON & HECKER L.L.P.**
2800 North Central Avenue, Suite 1600
Phoenix, Arizona 85004-1047
(602) 279-1600

Attorneys for Plaintiffs

X FILED ___ LODGED
___ RECEIVED ___ COPY

SEP 2 4 1998

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ Z DEPUTY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

JAYME NORBERG, personal representative of the estate of) SCOTT J. NORBERG, deceased, for and on behalf of ADAM) SCOTT NORBERG and CODY JARON NORBERG,) surviving sons of SCOTT J. NORBERG; JARON B.) NORBERG and DEENA S. NORBERG, surviving parents of) SCOTT J. NORBERG, )

                                Plaintiffs, )

vs. )

MARICOPA COUNTY, a public entity; MARICOPA) COUNTY SHERIFF'S OFFICE, a division of Maricopa) County; Maricopa County Department of Correctional Health) Services, a division of Maricopa County; JOSEPH M.) ARPAIO, MARICOPA COUNTY SHERIFF, and JANE DOE) ARPAIO, his wife; DAVID M. GURNEY and JANE DOE) GURNEY, his wife; ODANA M. MUSBACH and JOHN DOE) MUSBACH, her husband; MARTIN SPIDELL and JANE) DOE SPIDELL, his wife; JESSE KIMBROUGH and JANE) DOE KIMBROUGH, his wife; RODERICK A. DOUGLAS) and JANE DOE DOUGLAS, his wife; M. GANSSLE-) KAIPELEA and JOHN DOE GANSSLE-KAIPELEA, her) husband; WAYNE KUHNS and JANE DOE KUHNS, his) wife; CHRISTOPHER TERRACINO and JANE DOE) TERRACINO, his wife; JUDY GONDER and JOHN DOE) GONDER, her husband; JAMES L. ALLEN and JANE DOE) ALLEN, his wife; ROBERT HARGRAVE and JANE DOE) HARGRAVE, his wife; KIMBERLY WALSH and JOHN) DOE WALSH, her husband; WALTER SCOROBOGATY and) JANE DOE SCOROBOGATY, his wife; SANTOS SANCHEZ) and JANE DOE SANCHEZ, his wife; KAY CAMPBELL,) R.N. and JOHN DOE CAMPBELL, her husband, )

                                Defendants. )

No. CIV 97-0866-PHX-PGR

**FIRST AMENDED COMPLAINT**

1

## COMPLAINT

Plaintiffs Jayme Norberg, as personal representative of the Estate of Scott J. Norberg, and for and on behalf of Adam Scott Norberg and Cody Jaron Norberg, Scott J. Norberg's surviving sons, and Jaron B. Norberg and Deena S. Norberg, the surviving parents of Scott J. Norberg, for their first Amended Complaint against Defendants, allege as follows:

## I.    GENERAL ALLEGATIONS

1.    Plaintiffs bring this action pursuant to A.R.S. § 12-611 *et seq.*, DEATH BY WRONGFUL ACT.  They qualify as plaintiffs for the following reasons.  Jayme Norberg is the natural mother of Adam and Cody Norberg, surviving sons of Scott J. Norberg, deceased, and brings this cause of action on their behalf and as the personal representative of the Estate of Scott J. Norberg, deceased. Jaron and Deena Norberg are the natural, surviving parents of Scott J. Norberg, deceased.

2.    Plaintiffs have satisfied the provisions of A.R.S. § 12-821.01 by serving upon each Defendant a Notice of Claim more than sixty (60) days prior to the date of the filing of this Complaint. Defendants have not responded to the Notice of Claim.

3.    Maricopa County (the "County") is a public entity, formed and designated as such pursuant to Title 11, of the Arizona Revised Statutes, and as such is subject to civil suit and may be held independently or vicariously liable for the wrongful conduct of its officers and employees, including the individual members of the Maricopa County Board of Supervisors, and the officers and employees of its divisions, the Maricopa County Sheriff's Office (MCSO), and the Maricopa County Department of Correctional Health Services (MCDCHS).

4.    Sheriff Joseph M. Arpaio ("Arpaio") was, at the time of the events complained of herein, the duly elected sheriff of Maricopa County.  In such capacity, Arpaio was an officer, agent, and

2

employee of the County. His wrongful actions constitute actions of the County, and the County is also vicariously and directly liable for his wrongful conduct.

5.    Defendants David M. Gurney, Odana M. Musbach, Martin Spidell, Jesse Kimbrough, Roderick A. Douglas, Marie Ganssle-Kaipelea, Wayne Kuhns, Christopher Terracino, Judy Gonder, James L. Allen, Robert Hargrave, Kimberly Walsh, Walter Scorobogaty, Santos Sanchez, and Kay Campbell, R.N., are agents and employees of the County, who at the time of the events complained of herein were acting within the course and scope of their employment by the County, and under color of state law. These Defendants engaged in wrongful conduct which allowed, caused, and contributed to the cause of the death of Scott J. Norberg ("Scott") on June 1, 1996. The County and Arpaio are vicariously liable for their wrongful conduct, as alleged in this First Amended Complaint.

6.    The Defendants designated herein as "John Doe" and "Jane Doe" are the spouses of the respective Defendants and are so designated because the wrongful conduct of Defendants was engaged in for the benefit of their marital communities, thereby rendering the spouses and marital communities of Defendants liable for such conduct.

## II.    JURISDICTION AND VENUE

7.    This lawsuit asserts claims for relief for violations of constitutional rights under 42 U.S.C. § 1983 and for violations of Arizona law. It was originally filed on March 27, 1997, in the Maricopa County Superior Court. Defendants removed this lawsuit to the United States District Court pursuant to 28 U.S.C. § 1441.

8.    This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331. The Court has pendent jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as the parties are residents of Maricopa County, Arizona, and the events underlying this lawsuit occurred in Maricopa County, Arizona.

3

## III.  FACTUAL BASIS FOR CLAIMS FOR RELIEF

9.  The County and Arpaio are legally responsible for the management of the County's jail system and the establishment and implementation of policies, procedures, and protocols that govern the processing, handling, and management of pre-trial detainees who are in the custody of the MCSO.  Their responsibility includes making certain that such policies, procedures, and protocols satisfy all federal and state standards.

10.  The County and Arpaio are legally responsible for the screening, hiring, training, retaining, and supervision of all employees who have responsibility for the processing, handling, and management of pre-appearance and pretrial detainees in the custody of the MCSO.  This responsibility includes making certain that such employees satisfy all federal and state standards.

### A.  *The County and Arpaio had Actual Knowledge that Unconstitutional Conditions Existed Within the County Jails Before Scott Norberg Was Killed.*

11.  On January 9, 1995, the Honorable Earl H. Carroll entered an Amended Judgment in *Damian Hart, et al. v. Sheriff Jerry Hill, et al.*, No. CIV 77-479 PHX-EHC-MS, in the United States District Court for the District of Arizona.  The County and MCSO approved the Amended Judgment as to form and content.  The Amended Judgment ordered, among other things, that the County, MCSO, and Sheriff, in their operation and management of Maricopa County Jails, conform to certain minimum standards, including those formulated and promulgated by the National Commission on Health Care, under the title *Standards for Health Services in Jails*, and by the Commission on American Corrections Association, under the title of *Manual of Standards for Adult Local Detention Facilities*.

12.  Arpaio took no steps, or grossly inadequate steps, to implement the orders to which the County and MSCO agreed, and which the Amended Judgment ordered them to implement.  The County Board of Supervisors also failed to take any steps to ensure MCSO's compliance with the Amended

Judgment. It allowed Arpaio unrestricted discretion to implement the Amended Judgment on behalf of the County, with knowledge that it was substantially likely that Arpaio would not comply with the Amended Judgment. It also failed to establish any method of monitoring or ensuring County compliance with the Amended Judgment.

13. On or about March 25, 1996, the County was informed in a letter from the United States Department of Justice that, pursuant to the Civil Rights of Institutionalized Persons Act (CIRIPA), 42 U.S.C. § 1997, *et seq.*, the Department of Justice had conducted an investigation which focused on allegations of excessive force and denial of adequate medical care at Maricopa County Jails, including the County's primary intake facility, the Madison Street Jail.

14. The Department of Justice investigation concluded "that unconstitutional conditions exist at [the County's] Jails with respect to (1) the use of excessive force against inmates and (2) deliberate indifference to inmates' serious medical needs." The Department of Justice's March 25, 1996, letter placed the County and Arpaio on actual, formal notice of the existence of the precise unconstitutional conditions that in a few months would lead to Scott Norberg's death.

15. The County and Arpaio failed to take any steps to address the Department of Justice's findings, or to remedy the unconstitutional conditions in the County's jails with respect to the use of excessive force and the deliberate indifference to inmates serious medical needs. Instead, the County and Arpaio openly and publicly disregarded the Department of Justice's findings, and defended the unconstitutionally abusive policies, customs, and culture in effect in the County's Jails.

16. Arpaio's formal dismissal of the findings, eventually forced the United States to take action against the County and Arpaio to make them remedy the unconstitutionally abusive conditions existing within the County's jails.

**B.** *Scott Norberg was Subjected to Unconstitutionally Abusive and Indifferent Treatment in the Countys' Jails.*

1. Scott was Treated for Dehydration and Heat Exposure
a Few Hours Before his Arrest.

17.     On Friday, May 31, 1996, Scott Norberg was a 33 year-old father of two boys. He had been working in the sun all day when his car ran out of gas. He tried to push the car to a gas station, but became weak and disoriented. He walked to a convenience store, where he collapsed.

18.     Scott was taken by ambulance to Valley Lutheran Hospital, where he was treated by Dr. Stephanie Schroeder, a board certified, emergency room physician. Dr. Schroeder gave Scott a thorough physical examination, during which she noted no physical injuries to his body. She also placed Scott on a heart monitor and found no indication of heart problems or abnormalities.

19.     Scott was treated for acute heat exposure and dehydration. He was discharged later that afternoon. He spent the next few hours talking with his cousin at his cousin's office and then went off on his own.

20.     At approximately 8:30 p.m., Scott was arrested by Officers Kirkham and Breseman of the Mesa Police Department. Scott had been canvassing a Mesa neighborhood looking for the local bishop of the Mormon Church. He was disoriented and was exhibiting bizarre behavior. During his arrest, Scott was sprayed in the face with oleoresin capsicum, or "capstun."

21.     Scott's arresting officers noted that he was sweating profusely and acting strangely. Scott could not rationally communicate with the officers. Scott spoke very quickly and incoherently, in what the officers characterized as "gibberish." While Scott was being placed in handcuffs, he panicked and struggled briefly to get away from the officers.

22.     Scott ran a few yards down the street, but the officers talked him into returning. After the officers convinced Scott that they were truly police officers, and that he would be safe with them, Scott allowed them to put handcuffs on him and place him in a patrol car. Scott agreed to be handcuffed, after saying "OK, you're the good guys."

23.     Officer Kirkham took Scott to the Mesa Police Department Jail. She completed a medical questionnaire for Scott, stating that Scott was exhibiting bizarre behavior. She gave the form to the Mesa booking personnel, and the officer who booked Scott wrote in the comment section of Scott's booking record that he was "possibly [a] 918."

24.     The term "918" is the law enforcement code for a mentally disturbed person.

25.     At the Mesa Jail, Officer Kirkham and a Mesa Jail Detention Officer Boyer washed the capstun from Scott's face.

26.     Because Scott continued to exhibit bizarre behavior at the Mesa Jail, he was placed in isolation in the Jail's "observation tank," where he could be watched. Scott would occasionally make outbursts of gibberish, or yell phrases that made no sense. On several occasions, Officer Wight, the Mesa Police Transport Officer, asked Scott to be quiet. Scott complied and then dropped to one knee and begged for Officer Wight's forgiveness.

27.     Officer Wight took Scott to the Maricopa County, Southeast Jail at approximately 12:10 a.m. In dealing with Scott, Officer Wight observed that Scott could follow instructions, but it took him about 30 to 60 seconds to understand and react to instructions he was given.

28.     Officer Wight saw that Scott had no injuries at the time he transferred custody of Scott to the County at its Southeast Jail.

29.     County Detention Officer Donna Jackson booked Scott into the Southeast Jail.  Officer Wight described Scott's bizarre behavior to Jackson.  He specifically told her that it took Scott some time to process and react to instructions, so the Southeast staff should give Scott several seconds to think about and react to instructions.

30.     Jackson carefully reviewed Scott's booking sheet and saw the hand-written comment that Scott was "possibly a 918."  She also personally observed that Scott appeared "weird," and that he had a distant stare.

31.     Jackson booked Scott into the County jail system without properly screening him for medical and psychiatric illness.  The County's Jail used a central computer system, with a computerized, medical health questionnaire that must be filled out for each detainee booked into the County system.

32.     Jackson claims she asked Scott the medical screening questions from memory, and that she did not fill out Scott's medical questionnaire until later that evening, after she saw Scott exhibiting bizarre behavior.  When she did fill out Scott's questionnaire, she noted that he did not exhibit any bizarre behavior and that he did not appear to be intoxicated or on drugs.

33.     Scott stayed at the Southeast Jail from approximately 12:30 a.m. to 8:30 a.m. on June 1, 1996.  During the night, Jackson and Southeast Detention Officers Shurtz and Hill observed him exhibiting bizarre behavior.  These detention officers discussed Scott and his strange behavior and conferred as to whether Scott should be placed in isolation.

34.     MCSO policy and reasonable standards of jail practice required a booking officer to update a medical health questionnaire for an inmate if further observation or information indicated the information entered at the time of booking was not accurate.  At no time did Jackson or any of the Southeast detention officers revise Scott's booking records or medical questionnaire to reflect their

8

observations that he was exhibiting bizarre behavior. At no time did the Southeast detention officers refer Scott for further medical or psychiatric screening.

35. On the morning of June 1, 1996, Defendant Terracino and MCSO transport officer Martinez transported Scott from the Southeast Jail to the Madison Street Jail. Scott was scheduled to appear before a magistrate for his initial appearance at the 2:00 p.m., Justice of the Peace court session to be held in the courtroom facility at the Madison Street Jail.

36. During the transport, Terracino observed that Scott kept his eyes closed and that he walked with a staggered gait. Terracino thought Scott appeared intoxicated. Terracino never saw Scott open his eyes through the entire transport process. Martinez noted that Scott's body was hot and that he was sweating profusely.

37. Scott was received at the Madison Street Jail Intake Unit where he was to be processed for his court appearance.

38. During Scott's custody by the MCSO, he was a pre-appearance detainee. He never appeared before a magistrate for a determination of probable cause for arrest, or for a determination of whether he would be released or detained on bond.

39. During his detention at the Madison Street Jail, jail personnel observed that Scott was suffering from mental or emotional and physical impairment, which required that he be placed in isolation or referred for a medical evaluation.

40. When Scott was taken for his interview with Pretrial Services Agency ("PSA"), he sat at the PSA window, but did not respond to questions.

9

41.     Scott then wandered away from the area where he was instructed to stand, and he sat down on the floor. Defendant Musbach threatened that if Scott would not stand up, she would shock him with her stun-gun.

42.     When Musbach drew her stun-gun, other detainees said "leave him alone, he's confused," and "you don't have to do that." Musbach and Defendant Gurney grabbed Scott by his ankles and dragged him along the floor back to his holding tank.

43.     Later, when the holding tank where Scott and other inmates were being held was being cleaned, Defendants Douglas and Allen dragged Scott along the floor to a temporary holding tank, and then dragged him back when the tank was clean.

2.     Defendants Observed Scott's Bizarre Behavior
and Symptoms of Illness.

44.     During Scott's detention at Madison, jail personnel, including most of the Defendants, observed him to be (a) non-responsive; (b) looking confused and dazed; (c) sitting and laying down on the floor and being dragged from place to place; (d) having his eyes closed and having to be led around; and (e) exhibiting symptoms of being "not right" and "not all there," "talking nonsense," "incoherent the whole day," and "weird," having a "spacey look," and causing jail personnel to be "afraid that he might go off." Despite these observations, Defendants and other jail personnel failed to provide Scott with a medical evaluation, failed to refer him for medical evaluation, and failed to place him in isolation away from other detainees.

45.     Defendants' failure to appropriately evaluate and address Scott's medical and psychiatric conditions, in the face of his openly and extraordinarily bizarre behavior, constituted deliberate indifference to his serious medical needs. Appropriate screening and evaluation would have disclosed

complaints, symptoms, and conditions that were in need of being addressed and treated by competent

medical personnel and Scott's removal from the general pre-appearance detainee population.

### 3. Jail Personnel Asked the Court to Conduct Scott's Initial Appearance at his Holding Tank.

46. On June 1, 1996, at about 2:00 p.m., after having already observed Scott's bizarre

behavior, Musbach went to the initial appearance court staff and asked court clerk, Patricia Duran, if the

court staff would conduct Scott's initial appearance in his holding tank because she "was tired of

dragging his ass around."

47. Duran obtained Scott's paperwork from PSA. Scott's PSA Background Information

Sheet listed only his name and ethnicity. At the top of the form his PSA interviewer wrote "possibly a

918." In the comment margin, she further wrote that "defendant just looks at PSA interviewer, but will

not speak. Others in holding tank told PSA he was speaking to them."

### 4. Scott had a Department of Correction Hold, so no Matter What Release Decision the Commissioner Made, Scott Could Not be Released.

48. Scott's PSA interviewer wrote on his PSA worksheet that "DOC will place hold, sent.

end 3/7/97. Possible 918 – would not speak to PSA."

49. PSA had verified that the Department of Corrections would place a hold on Scott, so

under no circumstances would Scott be let out of jail on June 1, 1996, even if he posted bail. Scott had

to remain in custody until the Department of Corrections released the hold it placed on him.

50. *Pro tem* Commissioner Robert Bushor reviewed Scott's paperwork and wrote a bond

amount of $4770 on Scott's PSA paperwork. This was done with full knowledge that Scott's

Department of Correction hold would keep him in custody, and so that Scott would get credit for time

served if his Department of Correction hold resulted in his being sent back to jail.

11

5.  **Guards Took Court Staff to Scott's Holding Tank to Conduct his Initial Appearance, and Brutally Attacked Scott Without Provocation.**

51.     Bushor and Duran told Defendants Gurney, Musbach, and Kimbrough that they were ready to conduct Scott's initial appearance.

52.     Jail policy and practice was that initial appearances of uncooperative or psychiatric inmates be conducted at one of the isolation tanks directly across the hall from Tank 6, the general population tank used to hold justice court detainees. Jail personnel call these isolation tanks "AACs," which stands for "attitude adjustment cells." Scott had not been placed in an AAC.

53.     Kimbrough, followed by Gurney and Musbach, took Bushor and Duran to Tank 6 and opened the door. Scott was sitting on the floor, just inside the doorway. Scott had his eyes closed. His head was bowed down, and he appeared to be asleep. His back was to the door and the Defendants.

54.     Although each of the Defendants already knew who Scott was, they called out his name. Defendants were standing behind Scott, looking straight down at him as they called his name. Scott did not respond. Gurney verified with Musbach that it was Scott who was sitting on the floor in front of him.

55.     Gurney reached down and tried to jerk Scott to his feet by wrapping an arm around Scott's neck and trying to pull him backwards. As he pulled Scott up, Gurney drew his stun gun and began stunning Scott. The other Defendants immediately joined in the attack.

56.     Scott never made an aggressive movement toward Gurney, the other Defendants, or anyone else, before Gurney attacked him. He did nothing to provoke Gurney's attack other than not waking up and responding to his name being called.

12

**6. Scott was Fully Restrained Within Seconds, but Defendants Continued to Beat Him.**

57. Other Defendants rushed into Tank 6 and assisted with the attack on Scott. Defendants had Scott handcuffed and laying on his stomach within 30 to 40 seconds of initiating the attack. Within 58 seconds of initiating the attack, 11 of the Detention Officer Defendants were in Tank 6 or were standing at the door to Tank 6 waiting for Scott to be dragged into the hallway.

58. Defendants' attack on Scott was senseless, violent, brutal, and amounted to blatant excessive force. The attack in Tank 6 included, in part, (a) Gurney and Douglas punching and kicking Scott in the face and neck; (b) Kuhns, Kimbrough, and Allen handcuffing Scott behind his back (and therefore "restraining" him), and forcing, or "jacking," his handcuffed arms up to the level of his shoulders while placing knees and feet in his back and neck; (c) Gurney, Musbach, and Allen repeatedly applying stun-guns to his body; (d) Hargrave assisting Gurney while Gurney stunned Scott; (e) Douglas and Allen standing on Scott's back; (f) Terracino and others standing on Scott's limbs; (g) pounding Scott's face against the concrete floor; and (h) twisting his limbs in a way that would cause him intense pain.

59. Scott was handcuffed and on his stomach for most of the beating he took that the Defendants meted out in Tank 6. While he was being beaten, he repeatedly cried out for help and pleaded with Defendants to stop. He also pleaded for help from God.

60. At least 20 detainees in Tank 6 witnessed the beating Defendants administered on Scott in the Tank. They yelled to and begged the Defendants to stop beating Scott.

61. Defendants Walsh and Kimbrough kept the other detainees from trying to help Scott, while their counterparts continued to beat Scott.

7. <u>Defendants Dragged Scott into the Hallway, Where his Beating Continued</u>.

62. After approximately 1.5 minutes in Tank 6, Scott was dragged from the Tank into the hallway. This was done by one officer (either Spidell or Kuhns), who stood at Scott's head, and pulled Scott's handcuffed arms forward toward Scott's head, until Scott slid, face down, along the floor into the hallway. Scott weighed approximately 175 pounds, and he was not wearing a shirt. This manner of moving Scott is known among MCSO detention officers as "jacking up" an inmate. That technique caused Scott excruciating pain, and it was done maliciously and for that purpose.

63. The ten other Defendants at the scene, including the supervisor, Sergeant Kaipella, saw Scott being dragged from Tank 6 in this painful manner and allowed it to happen.

64. In the hallway, Defendants placed Scott in leg irons, kept him pinned to the floor on his face and stomach, and continued to beat him. Their beating included (a) kicking and striking Scott's head, throat, and limbs; (b) Spidell standing on his head and forcing it into the floor; (c) Allen standing in the middle of Scott's back; (d) "jacking" his arms up behind him; (d) twisting his legs into painful positions; (e) repeatedly stunning Scott with their stun-guns; (f) taking off Scott's boots and stomping on his feet and ankles; and (g) kicking him in the groin.

65. As Phoenix Policeman John Corey testified, while Defendants were beating Scott in the hallway, at least one Defendant repeatedly yelled "do you want some more of this," and "so you think you're a fucking tough guy."

66. In the hallway, Scott continued to plead with Defendants to stop beating him. He also cried out for help from God and pleaded with other detainees to help him.

14

8.     <u>Scott was Forced into a Restraint Chair.</u>

67.     Defendant Gonder brought a restraint chair to the scene, and placed it in front of Tanks 5 and 6. None of the Defendants had ever received any training in the use of the restraint chair prior to June 1, 1996, nor did the County or MCSO offer detention personnel any courses or organized training in the use of the restraint chair.

68.     Defendants picked Scott up by his feet and handcuffed arms, and sat him in the chair. Scott's handcuffed hands were pulled up and forced over the back of the chair. Defendants, including Spidell "jacked" Scott's handcuffed arms up into the air behind him to gain leverage, and to force Scott's head down between his knees.

69.     Shortly after being placed in the chair, and after shoulder and lap restraints were tightened around Scott, Spidell exclaimed "Maybe we should just kick his ass until he stops fighting."

70.     Detainees in Tanks 5 and 6 pounded on their Plexiglas windows and yelled at Defendants to stop beating Scott. Inmates yelled such things as "leave him alone, your killing him," and "why don't you kick him some more, he might not be dead."

71.     Gurney became enraged by the detainees' efforts to get Defendants to stop beating Scott. Gurney flung open the door of Tank 6 and yelled to the detainees that "if anyone had anything to fucking say, they could say it to his face." When no detainees took Gurney up on his challenge, Gurney yelled "I thought so, because you're not men," and he returned to Scott's beating.

72.     Musbach also yelled into Tank 6 after Gurney's challenge went unanswered.

73.     After Scott was placed in the chair, Defendants ran his leg iron chain through the back of the chair and used it to pull Scott's leg tight to the chair while they fastened it to the chair's restraints. Other Defendants, including Kimbrough, placed Scott's other leg in restraints.

74. Musbach pushed her knee into Scott's stomach and groin and drove all of her weight into him for several minutes. Allen and Scorobogaty drove their knees into Scott's groin and stomach as he sat in the chair.

75. Terracino and Allen grabbed Scott's hair and used it to pull Scott's head backwards.

76. Several Defendants, including Spidell, Gurney, Musbach, and Walsh, pushed Scott's head forward until his chin was pressed into his chest. Scott's head was forced into this position immediately after being placed in the chair, and it remained forced into his chest until he died.

77. Musbach used a towel to force Scott's head into his chest.

9. Defendants Twisted a Towel Around Scott' Face and Neck.

78. Approximately 2 minutes after Scott was placed in the chair, Defendants wrapped a towel around his face and neck. Walsh twisted the ends of the towel together to pull it tightly around Scott's face and neck. She held the towel around Scott's face and neck for at least 4 minutes and 18 seconds. She did not release the towel until after Scott was dead.

79. Formal MCSO policy prohibited covering the face of an inmate who was being restrained. In spite of MCSO's explicit policy, it was standard, accepted practice for supervisory personnel to allow and even encourage detention officers at Madison Street intake to wrap towels around the faces of detainees who were put in the restraint chair.

80. Defendants claimed the towel was used to keep Scott from spitting.

81. Scott never spit or threatened to spit at any of the Defendants.

16

10.    Scott was Stun-gunned While he was in the Restraint Chair.

82.    Defendant Musbach, and at least one other Defendant, repeatedly used their stun-guns to stun Scott in his chest and abdomen while he was strapped into the restraint chair and his head was being forced down.

83.    Autopsy findings indicate that Scott was stunned at least five times in the chest and abdomen, which had to occur when he was in the restraint chair, and that in total, Scott was stunned with a stun-gun at least 19 times (and perhaps as many as 21 times) during his beating. All but two or three of these stun-gun applications occurred after Scott was handcuffed. MCSO's explicit policy prohibits the use of a stun gun more than twice during a restraint episode.

84.    While Defendants held Scott in the chair with the towel around his face and neck, and his head forced into his chest, Spidell jokingly yelled to Bushor, "hey judge, are you going to OR this guy," meaning release him on his own recognizance.

85.    The towel wrapped around Scott's face and neck either cut off, or greatly restricted, his air flow. Approximately four minutes after Walsh twisted the towel around Scott's face, and while Defendants pushed his head deep into his chest, Scott's hands, feet, and face began to turn blue from oxygen deprivation. Scott began to have involuntary spasms and convulsions in what were his body's last, desperate efforts to get air.

86.    At or before the time Defendants killed Scott, Walsh warned Spidell that she did not think Scott could breathe. Spidell responded "who gives a fuck." Walsh then turned to warn Gurney that Scott could not breathe. Gurney said "I don't give a shit."

87.    Scott asphyxiated and died in the restraint chair at 2:13 p.m., eleven minutes after Defendants began their attack. At the time he died, he had a bunched-up towel twisted around his face

17

and neck. He feet were shackled to the chair. Three Defendants were forcing his head down into his chest. At least two Defendants were pressing in on his stomach and groin. He was being stun-gunned in his chest and stomach. Several Defendants were pushing down on his shoulders and pushing in on his limbs.

88. Never, during the course of their brutality did Defendants back off and give Scott a chance to breathe.

### 11. Defendant Campbell Watched Scott Being Beaten and Killed Without Intervening or Even Checking on his Condition.

89. Scott's beating in the hallway outside of Tank 6 occurred close to the nurse's office. Defendant Campbell was the nurse on duty during Scott's beating.

90. Campbell came out of her office shortly after Scott's beating began. She stood by while Scott was being beaten in the hallway and after he was placed in the restraint chair.

91. Campbell watched Defendants twist the towel around Scott's face and neck, push in on his head, drive their knees into him, stun-gun him, pull his hair, and press in on him from all angles.

92. At least once after the towel had been twisted around Scott's face and neck, Campbell left the scene and casually walked back inside her office.

93. Campbell never intervened in Scott's beating until he was dead. She became involved only after Walsh yelled to Campbell that Scott was no longer breathing.

94. Witnesses have testified that Campbell smiled and joked with guards as Scott was being smothered.

18

12. **Defendant Kaipelea Allowed her Subordinates to Direct her, and Watch as Numerous MCSO Policies were Violated.**

95. Defendant Kaipelea was the only supervising sergeant on duty at the Madison Street Intake Unit at the time of Scott's beating. Kaipelea was assigned to her supervisory post at the Madison Street Intake Unit only five days before Scott's death. She was given no training in intake supervision before assuming her post.

96. Kaipelea gave no orders or instructions during Scott's beating. Instead, she fetched restraint weapons, such as towels and leg irons, for the other Defendants. Kaipelea observed, acquiesced in, and participated in numerous violations of MCSO policy during Scott's beating and allowed herself to be directed by the Defendants who were more actively engaged in the beating.

13. **Defendants Callous Indifference to Scott's Safety and Medical Needs Continued After he was Taken out of the Chair.**

97. After Scott asphyxiated and died, he was taken out of the restraint chair and placed on the ground where he lay motionless. His eyes were open, and his pupils were fixed and dilated. He had no pulse. He was not breathing.

98. Rather than begin resuscitative efforts, Defendants continued to "restrain" Scott, and spent precious time handcuffing his lifeless body.

99. Campbell made four trips to her office from the time Scott was taken out of the chair, until she placed an oxygen mask on him. One minute and 37 seconds elapsed while she ran to and from her office. Because Scott was dead, the oxygen mask could not force air into Scott's lungs, and another few minutes elapsed before Campbell returned from her office with an AMBU bag, and finally got some air into Scott's lungs.

100. All but a few of the Defendants made quick exits from the death scene.

19

101.     Jail personnel called "911," and in a chillingly casual and conversational manner, informed emergency response that they had a person who had stopped breathing.

102.     Paramedics arrived within five minutes, took over resuscitation efforts, and took Scott to Phoenix Memorial Hospital where he was pronounced dead.

### 14.     Scott's Body Suffered Massive Injuries as a Result of this Beating.

103.     Scott suffered massive injuries as a result of his beating by Defendants. Among the injuries he suffered were severe bruises and hemorrhaging on the top of his head, severe bruises to his face, neck, back, arms, and legs, two broken teeth, a lacerated tongue and penis, lacerations and abrasions on his face and body, and severe bruising of his genitals.

104.     Defendants fractured the right side of Scott's larynx during his beating and restraint, making breathing excruciatingly painful, if not impossible.

### C.     *Defendants Orchestrated and Carried Out a Cover-up of the Circumstances Surrounding Scott's Death.*

### 1.     MCSO Began to Intimidate Witnesses Immediately After Scott's Killing.

105.     After Scott was taken out of the chair, detainees in Tanks 5 and 6 continued to yell that Defendants had murdered Scott, and they "they would testify against them." Among the most vocal of the detainees was Herbert Thompson.

106.     When the detainees were taken from Tank 6 to go to Court, Thompson yelled that he was going to "tell the judge everything he saw." He was told by certain Defendants, "then you can see the judge tomorrow," and was left behind in Tank 6 while the other detainees were taken to court. Then, fearing for his safety, Thompson promised he was not going to say anything, and he was allowed to rejoin the group.

107. A few days after Scott was killed, Detainee Travis Bendtin talked to the media about what he saw happen to Scott. Within a few days of his story appearing in the newspaper, a uniformed MCSO officer in a private vehicle drove slowly by Bendtin's house a few times. Bendtin felt this was sending a clear message that the officer knew where he lived. Bendtin lived in Central Phoenix, and not an MCSO jurisdiction. Bendtin feared for his safety, so he contacted the FBI.

108. After the Justice Court session, Kaipelea approached Duran and asked for a copy of Scott's PSA paperwork, which she was given.

109. Kaipelea reviewed Scott's PSA paperwork in Duran's presence and was visibly gleeful that Scott appeared from his paperwork to be a street person, or someone that no one would care was gone. At that moment, Duran became concerned that the MCSO was going to start to cover up what it did to Scott.

### 2. MCSO knowingly sabotaged its own criminal investigation to insulate its personnel from prosecution.

110. MCSO assigned a team of detectives from its Homicide Division to "investigate" Scott's death. This criminal investigation was deliberately designed and executed to clear Defendants, Arpaio, and the County of any wrongdoing in Scott's killing.

111. MCSO detectives interviewed all but two of the Detention Officer Defendants on the night of Scott's killing. These interviews were conducted at the MCSO's offices. None of the Defendants were read their *Miranda* rights. Most Defendants were not told until the end of their interviews that the MCSO was examining whether a criminal homicide had occurred. Naturally, this failure to *Mirandize* would make any of the Defendants' statements inadmissible in a criminal prosecution against them.

21

112.     As a further effort to sabotage their own investigation, an investigator from the MCSO's Internal Affairs Division participated in each of the interviews. This violated *Garrity v. New Jersey*'s fundamental, and universally known rule rendering inadmissible in a criminal case any statement made by a law enforcement officer when an internal affairs agent is also present during the criminal investigation interview.

113.     In contrast, when MCSO's Homicide detectives went to the Mesa Police Department (which undoubtedly knows about the *Garrity* rule) to interview Mesa Police witnesses, the MCSO Internal Affairs detective monitored the interviews from a separate, mirrored observation room.

3.     <u>MCSO deliberately conducted slanted interviews, in an effort to suppress information that indicated its personnel beat and killed Scott.</u>

114.     The MCSO detectives conducted dozens of interviews of witnesses with knowledge of Scott's arrest, behavior, beating, and death. Their interview tactics and methods of questioning were structured to avoid bringing out how Scott was brutally beaten and killed.

115.     During their interviews of Defendants and detainee witnesses, detectives failed to ask any significant follow-up questions when confronted with facts demonstrating that Scott's beating was excessive and unprovoked.

116.     The MCSO detectives repeatedly asked suggestive and leading questions during interviews to prompt responses that would be favorable to the MCSO and Defendants, and to try to bolster the spin that MCSO and its detectives intended to place on Scott's killing.

117.     In addition, MCSO detectives deliberately failed to record their interview of Duran, who told them that Scott did nothing to instigate his beating, and that the Defendants used excessive and unprovoked force against Scott. Instead, the detective paraphrased Duran's interview in a short

22

summary, which Duran has testified does not accurately reflect the account of Scott's death that she gave the detective.

118.    The same detective that interviewed Duran also conducted an unrecorded interview with Bushor. After screening Bushor's comments and finding them less damaging than Duran's, the detective re-interviewed Bushor and tape-recorded the second interview. Duran was never re-interviewed.

4.    Defendants Gave False and Deliberately Understated Accounts of Their Treatment of Scott.

119.    Defendants knowingly and deliberately provided false accounts of the circumstances underlying Scott's killing, and the brutal treatment to which Scott was subjected during his custody.

120.    Defendants falsely reported that Scott initiated the confrontation by threatening Defendants and court staff. They deliberately provided false accounts of Scott's brutal killing, by claiming Scott was never punched, kicked, or stomped by Defendants. They also grossly and intentionally under-reported the number of times stun-guns were used on Scott, as well as the actions they took during their 11-minute beating and killing of Scott.

5.    MCSO's Written Report of its Investigation is Improperly Slanted, Improperly Dismisses and Fails to Account for Credible Witness Accounts of a Homicide, Fails to Analyze Whether a Crime was Committed, and Had Key Information Deliberately Removed.

121.    On August 27, 1996, Arpaio released to the FBI and Maricopa County Attorney a copy of the MCSO's Critical Incident Report related to Scott's death ("Report"). The MCSO did not give the Norbergs a copy of the Report until October, 1996, when the Report was released to the media.

122.    The Report was primarily authored by MCSO Homicide Division officers and agents. On information and belief, Arpaio participated and oversaw aspects of the Report's drafting and approval.

23

123. The MCSO's entire Report was drafted to put MCSO's spin on what happened to Scott. Much of the Report deals with Scott's behavior prior to his arrest, his arrest record, and the remarkably slanted and inconsistent detention officer accounts of their actions.

124. The Report, and its summary of findings, glosses over the numerous facts and witness accounts, which demonstrated that Scott's beating was vicious, excessive, and unprovoked.

125. The Report, and its summary of findings, also grossly understates the injuries Defendants inflicted on Scott, which were so severe that they alone proved Scott had been brutally beaten by Defendants.

126. The 135 page narrative section of the Report, which condenses the Report's 2123 pages of witness interviews into the MCSO's summary version of what happened to Scott, fails to mention or address critical facts demonstrating that Scott's attack and beating were excessive and unprovoked, including key statements and admissions of Defendants who participated in his beating. It also fails to mention or analyze the observations of independent witnesses like Duran, and the dozens of inmate witnesses whose accounts of Scott's killing (unlike those of jail personnel) were remarkably consistent.

127. The Report fails to give any weight to the accounts of detainees. Instead, when dealing with the detainees' accounts, the Report goes to great lengths to create or draw attention to possible inconsistencies, and to state or imply that these witnesses lacked credibility.

128. The Report contains no analysis of whether Defendants committed a crime in their treatment of Scott.

129. MCSO included in its report what appeared to be a full copy of the County Medical Examiner's report of Scott's autopsy, but the page depicting the serious injuries to Scott's face, head, and neck was removed before the MCSO numbered the Report's pages.

130.     Before Arpaio released the Report, MCSO removed approximately 150 pages discussing the restraint chair, the dangers inherent in its use, the Medical Examiner's opinion that Scott asphyxiated due to improper use of the restraint chair, and how no one at the MCSO ever received any training in the use of the restraint chair before June 1, 1996. The County and Arpaio continued to try to keep this information from Plaintiffs well into this lawsuit.

      6.     <u>MCSO Began a Campaign to Influence Autopsy Results and Manipulate the Media to Draw Attention Away from its Killing of Scott.</u>

131.     Shortly after Scott was pronounced dead, MCSO Detective Ondrejech completed a "red tag" for Scott's body. This document is required for the Medical Examiner's Office to take custody of a body. Ondrejech wrote a description of Scott's death on the red tag that included how he was placed in a restraint chair, and how a towel "was placed over his mouth." In large, capital letters at the bottom of the red tag, Ondrejech wrote " * JAIL INMATE," which he underlined twice.

132.     Later that evening, and through much of the night, MCSO detectives conducted their interviews of Defendants. During these interviews, MCSO detectives learned that Scott was repeatedly stunned with stun-guns, that Scott was stunned after being placed in the chair, that at least Gurney may have "taken a swing at him," that Spidell said Defendants should "kick Scott's ass until he stopped fighting," that some Defendants stood on Scott's back and limbs, and that Spidell said he "did not give a fuck" when Walsh warned him that Scott could not breathe. They also knew that the towel was held around Scott's mouth.

133.     At least one Defendant, Walsh, told detectives that Defendants' conduct was wrong, that Scott's head should not have been pushed down so far, and that she warned other Defendants that Scott could not breathe.

25

134. In spite of this knowledge, MCSO Sgt. John Klienheinz addressed the media the next day and told the public that only "hands-on force" was used on Scott. He also publicly promised "there was never anything as far as any type of chokehold or any type of electronic device used to try to subdue this individual."

135. Detainee witnesses were interviewed by the media on June 2, 1996, and told reporters how Defendants repeatedly stun-gunned Scott, and how they wrapped the towel around his face and neck to cut off his air.

136. Only after detainee witnesses went public with their accounts did MCSO acknowledge, off-camera, that a stun-gun and towel were used on Scott. MCSO claimed, however, that the stun-gun was only used twice, and that the towel was only used to prevent Scott from spitting.

137. To head off what was quickly becoming a public relations or criminal investigation disaster, Arpaio and MCSO began a concentrated effort to feed misinformation about Scott to the media, by reporting that Scott was high on drugs at the time of his killing, that he died only after he became combative with detention officers, that he tried to attack and spit on court staff, and that he tried to strike and spit at Defendants. Each of these statements was false. Arpaio and MCSO also released Scott's criminal record, in an effort to vilify him in the public's mind, or make the MCSO's claim that Scott attacked or threatened the court staff to be more believable.

7.  <u>MCSO Placed Intense Pressure on the Medical Examiner's Office to Make Favorable Findings for the MCSO, and to Keep the MCSO Involved in Every Aspect of the Case.</u>

138. On the morning of June 3, 1996, Mary Dudley, M.D., performed an autopsy on Scott for the Medical Examiner's Office. The MCSO closely shadowed Dudley as she dealt with Scott. Detectives had numerous conversations with her about Scott, and the MCSO's version of the

26

circumstances of his death. Two MCSO detectives even stood by Dudley while she performed her autopsy. One of the MCSO detectives was the same one who had been told during the interviews about the brutality of the attack on Scott and the detention officers' indifference to warnings that they were choking Scott to death.

139. MCSO also monitored the Medical Examiner's Office's communications regarding Scott. On June 2, 1996, the day after Scott was killed, Klienheinz instructed the Medical Examiner's Office to refer all requests for information to him. He even gave the Medical Examiner's Office his pager number. This typed instruction was stapled to the front page of the Medical Examiner's Office contact and public information inquiry log, which was kept in Scott's file.

8. <u>The Medical Examiner's Office did not Report Scott's Fractured Larynx, and Several Other Serious Injuries Which Could Only have Resulted from the use of Excessive Force.</u>

140. Dudley's June 3, 1996, autopsy found massive injuries to almost every part of Scott's body. Dudley, however, did not take note of a pronounced, displaced fracture on the right side of Scott's larynx. She also failed to note serious bruises and cuts in Scott's groin area.

141. At 5:00 p.m. on June 3, 1996, Klienheinz again addressed the media and said "going through the body there was no damage to the neck."

142. On June 4, 1996, Dudley "re-examined" Scott's body. This time she noted a distinct contusion on the right side of Scott's throat, just outside the point of the fracture of Scott's larynx.

143. On June 5, 1998, Karen Griest, M.D., a forensic pathologist hired by Plaintiffs, conducted a second autopsy of Scott. Griest noted significantly more damage to Scott's body than Dudley reported having found. Griest found many more stun-gun burns on Scott, as well as more bruises, cuts, and

abrasions. Griest found a reddening across the front of Scott's neck. She found bruising and a significant cut on Scott's penis.

144. Griest found that Scott's larynx had been fractured and that it had bleeding throughout the fracture line.

145. The injuries Griest found, which Dudley had not initially reported, were of the type that could only have occurred as a result of excessive force being used on Scott.

9. Scott's Fractured Larynx was Returned to the Medical Examiner's Office, and has now Disappeared, Along with Other Evidence.

146. Griest took Scott's larynx back to Dudley to discuss it with her. Dudley claimed she must have fractured the larynx post-mortem, and that the bleeding had to have occurred post-mortem.

147. Dudley showed the larynx to Chief Medical Examiner Philip Keen. Keen claimed he had never seen such post-mortem bleeding before.

148. Dudley gave Griest an "Evidence Receipt" acknowledging that Dudley took custody of Scott's larynx.

149. The Medical Examiner's Office knew there was a criminal homicide investigation of Scott's death. Scott's case was treated as a "red dot" case by the Medical Examiner's Office. A red dot case is one in which investigation, criminal inquiry, or litigation is likely. The protocol in a red dot case is to keep tissue and fluid samples for at least five years, if not indefinitely.

150. The Medical Examiner's Office never logged receipt of Scott's fractured larynx in Scott's file or in any other internal records. On September 22, 1998, the County's lawyers formally verified that the Medical Examiner's Office no longer has Scott's fractured larynx.

151. If Scott's fractured larynx had been kept, a cross-section if the tissue would have proved that the bleeding in the fracture occurred before Scott's death.

28

152.    Similarly, Medical Examiner's Office policy and practice is for a pathologist to record in a log book all x-rays taken of autopsy subjects. Dudley took x-rays of Scott's body on June 3, 1996. She did not, however, make any notation that she had taken x-rays of Scott's body in the log book.

153.    Plaintiffs were not made aware that x-rays were taken of Scott until August 26, 1998.

154.    On September 22, 1998, Dudley and the County's counsel claimed that Dudley took four x-rays of Scott: three were of his chest, and one was of his abdomen.

155.    However, Medical Examiner's Office records establish that Dudley also took an x-ray of Scott's head. But, that x-ray is no longer in the Medical Examiner's files. An x-ray of Scott's head might have shown the fracture in his larynx.

10.     The Medical Examiner's Office Misclassified Scott's Cause and Manner of Death.

156.    The Medical Examiner's Office determined Scott's cause of Scott's death to be "positional asphyxiation."

157.    Although Scott's death was caused by asphyxiation, the exact cause of his death was restraint asphyxiation.

158.    The Medical Examiner's Office misclassified the manner of Scott's death as an "accident."

159.    Scott was killed at the hands of detention officers, and his manner of death should have been classified as a homicide.

## IV.  THEORIES OF LIABILITY AND CLAIMS FOR RELIEF

### A.  *Liability of Detention Officer Defendants*

160.  The Detention Officer Defendants' attack on Scott was wholly unreasonable and unjustified under the circumstances then existing and bore no reasonable relation to any legitimate penological interest.  Defendants continued and escalated the attack until Scott was dead.

161.  To the extent a need for forcible restraint of Scott ever arose, it was unnecessarily and unjustifiably created by Defendants themselves.

162.  The Detention Officer Defendants had a duty to protect and care for Scott, which required each Defendant to intervene to protect Scott from unconstitutionally excessive force being applied by other Defendants.   None of the Defendants, however, intervened to protect Scott from being beaten and killed.

163.  Defendant Kaipelea had a supervisory responsibility to ensure that all MCSO policies with respect to use of force and restraint devices were correctly carried out and to ensure that those under her supervision did not apply unconstitutionally excessive force to Scott.  Kaipelea not only allowed MCSO policies to be violated during Scott's beating, but she allowed herself to directed by her subordinates and failed to intervene to protect Scott from their unconstitutionally abusive conduct.

164.  Each Detention Officer Defendant demonstrated deliberate indifference to Scott's medical and psychiatric needs, in that it was obvious to Defendants that Scott desperately needed medical attention during his beating, but none of the Defendants attempted to render medical aid until Scott was dead.

165.  Each of the Detention Officer Defendants who had contact with Scott before his beating noted either his bizarre behavior or his symptoms of medical and psychiatric illness.  Each of these

30

Defendants demonstrated deliberate indifference to Scott's medical and psychiatric needs by failing to refer him for medical or psychiatric screening and care.

### B. *Liability of Defendant Campbell*

166. Defendant Campbell, as the nurse on duty at the Madison Street Intake Unit, had a responsibility to protect and care for Scott, which required her to intervene to protect Scott from unconstitutionally excessive force. In spite of the savagery of Scott's beating, Campbell did not intervene to protect Scott from being beaten and killed.

167. Campbell also demonstrated deliberate indifference to Scott's medical and psychiatric needs, in that it was obvious to her that Scott desperately needed medical attention during his beating, but she did not attempt to give him any medical aid until after he was dead. Instead, Campbell, a trained nurse, simply watched Defendants cut off Scott's air until he turned blue, convulsed, and died.

168. In the critical moments after Scott stopped breathing, the care Campbell provided was ineffective and inadequate.

### C. *Liability of the County and Arpaio*

169. Arpaio is a policy maker of the County, with the authority and responsibility to establish policy for the County's jails. Arpaio's actions and inactions are actions of the County.

170. The County has oversight and supervisory responsibility over its jails.

171. The County and Arpaio, directly and through their employees who were responsible for the training of those who participated in or observed the attack on Scott, were negligent, deliberately, and callously indifferent in training jail personnel in the appropriate, lawful and constitutional policies, procedures, and protocols for the providing of medical care and the processing, handling, and management of pre-appearance and pre-trial detainees.

31

172. The County and Arpaio, directly and through their employees who were responsible for the training of those who participated in or observed the attack on Scott, were negligent, deliberately, and callously indifferent in the training of jail personnel in the use of restraint devices and tactics, including use of the stun-gun, the restraint chair, and the towel.

173. The County and Arpaio were deliberately, recklessly, and callously indifferent to the care and safety of jail detainees, through fostering, encouraging, and knowingly accepting formal and informal jail policies condoning brutality, the use of excessive force, and indifference to medical and psychiatric care, such that Scott's beating and killing was substantially likely to occur.

174. The County's and Apraio's deliberate, reckless, and callous indifference to the unconstitutionally abusive conditions the County's jails, with full knowledge of the existence of such conditions, caused or substantially contributed to Scott's treatment by jail personnel and his killing by Defendants.

175. The County and Arpaio knew or should have known that unconstitutional policies, practices, and customs existed within the County's jails, and they failed to address these policies, practices, and customs, or establish and implement appropriate policies, procedures, and protocols for providing medical care and psychiatric care, and processing, handling, and managing pre-trial detainees in the custody of the County which conformed to applicable federal and state standards.

176. The County and Arpaio permitted the implementation of inappropriate, *de facto* policies which reflected or represented policy, practices, and customs which deviated from acceptable standards, yet were deemed acceptable by all Defendants. The unconstitutional conduct of Defendants as alleged herein implemented and executed the following policies and customs of the County, Arpaio, and the MCSO:

a)        implicit authorization, approval, and knowing acquiescence in wrongful conduct by County and MCSO employees in their treatment of detainees;

b)        the use of unconstitutionally excessive force by jail personnel;

c)        acceptance of the use of unconstitutionally excessive force by jail personnel;

d)        failure to discipline or terminate jail personnel known to have engaged in the use of excessive force or other inappropriate practices, and creating an atmosphere where jail personnel believe they will not be disciplined for abusive conduct toward detainees;

e)        failure to eliminate jail policies, practices, and customs which deviated from applicable federal and state standards for jail operations;

f)        failure to conduct adequate background checks of newly hired jail personnel;

g)        failure to adequately supervise jail personnel;

h)        failure to adequately train jail personnel;

i)        failure to investigate, report, and follow up on prior incidents involving the use of excessive force by jail personnel;

j)        failure to provide appropriate medical and psychiatric screening and evaluation;

k)        failure to provide appropriate medical and psychiatric care;

l)        maintaining a highly publicized and inappropriate management preference for the creation and maintenance of harsh jail conditions;

m)        creating and encouraging secrecy and a code of silence within the County jail system; and

n)        insulating and protecting jail personnel from civil and criminal liability for the wrongful acts in the treatment of detainees.

## V.     COUNT I

**VIOLATIONS OF TITLE 42, UNITED STATES CODE § 1983
DEPRIVATION OF RIGHTS, PRIVILEGES AND IMMUNITIES
SECURED BY THE CONSTITUTION AND LAWS OF THE UNITED STATES**

177.     Plaintiffs incorporate herein, as if fully set forth, the allegations of paragraphs 1-176.

178.     The wrongful conduct of Defendants, as alleged herein, constitutes violations, under color of state law, of Title 42, U.S.C. § 1983, in that with deliberate and callous indifference, they deprived Scott and plaintiffs of rights, privileges and immunities secured to him by the Constitution and laws of the United States.

## VI.     COUNT II

**VIOLATIONS OF UNITED STATES CONSTITUTION, ART. IV, § 2
DENIAL OF PRIVILEGES AND IMMUNITIES SECURED TO ALL CITIZENS**

179.     Plaintiffs incorporate herein, as if fully set forth, the allegations of paragraphs 1-178.

180.     The wrongful conduct of Defendants, as alleged herein, constitutes violations of the United States Constitution, Art. IV, § 2, in that Scott was denied privileges and immunities granted to all citizens of the United States.

## VII.     COUNT III

**VIOLATIONS OF UNITED STATES CONSTITUTION, AMENDMENT IV
DEPRIVATION OF RIGHT TO BE SECURE AGAINST UNREASONABLE SEIZURE**

181.     Plaintiffs incorporate herein, as if fully set forth, the allegations of paragraphs 1-180.

182.     The wrongful conduct of Defendants, as alleged herein, constitutes violations of United States Constitution, Amendment IV, in that Scott was deprived of his right to be secure against unreasonable seizure through the use of excessive force.

# VIII.   COUNT IV

## VIOLATIONS OF UNITED STATES CONSTITUTION, AMENDMENT XIV, § 1 DEPRIVATION OF PRIVILEGES GUARANTEED TO ALL CITIZENS; DEPRIVATION OF LIFE AND LIBERTY WITHOUT DUE PROCESS OF LAW; DENIAL OF EQUAL PROTECTION OF THE LAWS

183.    Plaintiffs incorporate herein, as if fully set forth, the allegations of paragraphs 1-182.

184.    The wrongful conduct of Defendants, as alleged herein, and under color of state law constitutes violations of the United States Constitution, Amendment XIV, in that Plaintiffs Adam Scott Norberg and Cody Jaron Norberg, have been deprived of their constitutional interest in the continued familial companionship and society of their father.

185.    The wrongful conduct of Defendants, as alleged herein, and under color of state law constitutes violations of the United States Constitution, Amendment XIV, in that Plaintiffs Jaron and Deena Norberg, have been deprived of their constitutional interest in the continued familial companionship and society of their son.

186.    The wrongful conduct of Defendants, as alleged herein, and under color of state law, constitutes violations of United States Constitution, Amendment XIV, in that Scott was deprived of privileges and immunities guaranteed to all citizens of the United States; was deprived of his life and liberty without due process of law; and was denied the equal protection of the law.

# IX.   COUNT V

## CONSPIRACY TO VIOLATE CIVIL RIGHTS / 42 U.S.C. 1983

187.    Plaintiffs incorporate herein, as if fully set forth, the allegations of paragraphs 1- 186.

188.    Acting under color of state law, individually and collectively, Defendants agreed and conspired to cover up evidence of the actual circumstances of Scott's killing and to suppress evidence and witness accounts which demonstrated that Defendants not only subjected Scott to unconstitutionally

35

abusive treatment, but were liable both civilly and criminally for their conduct in causing Scott's death.

189.   The purpose of Defendants' conspiracy was to prevent Plaintiffs from having meaningful access to the courts to seek redress for Scott's death.

190.   In furtherance of their conspiracy, Defendants, among other things, intentionally and deliberately gave false and misleading information about Scott's killing to MCSO detectives in an effort to downplay the brutality of their attack upon Scott, to create the false impression that his treatment was somehow justified or provoked, and to cover up the individual and cumulative acts of brutality they inflicted upon him.

191.   In furtherance of their conspiracy, Arpaio, MCSO detectives, and other County agents and employees conducted a deliberately biased and inadequate investigation of Scott's killing, with the specific goals of covering up the truth about Scott's brutal treatment by Defendants, clearing Defendants of any wrongful conduct, and making civil and criminal prosecution of Defendants difficult or impossible to pursue.

192.   In furtherance of their conspiracy, County agents and employees destroyed, discarded, and suppressed important evidence and information related to the circumstances of Scott's death.

193.   As a result of Defendants' conspiracy and the acts Defendants took in furtherance of their conspiracy, Plaintiffs' rights of meaningful access to the courts as protected by the First Amendment and the Privileges and Immunities and Due Process Clauses of the Fourteenth Amendment have been denied.

194.   Plaintiffs have suffered actual damages in that their ability to identify and pursue causes of action against Defendants has been severely hampered due to the suppression and destruction of evidence, and the value of their action against Defendants has been materially reduced as a result of the acts Defendants took in furtherance of their conspiracy.

36

## X.   COUNT VI

## NEGLIGENCE

195.   Plaintiffs incorporate herein, as if fully set forth, the allegations of paragraphs 1-194.

196.   The wrongful conduct of Defendants, as alleged herein, constitutes negligence under the common law of Arizona, in that Defendants breached their duty of ordinary care to protect Scott from unreasonable risks of harm.

## XI.   COUNT VII

## GROSS NEGLIGENCE, BAD FAITH
## AND WANTON, WILLFUL AND MALICIOUS CONDUCT

197.   Plaintiffs incorporate herein, as if fully set forth, the allegations of paragraphs 1-196.

198.   The wrongful conduct of Defendants, as alleged herein, constitutes gross negligence, bad faith, and wanton, willful and malicious conduct, in that Defendants acted or failed to act when they knew or had reason to know that their conduct created unreasonable risks of serious bodily harm to Scott, and a high probability that substantial harm would result.

## XII.   ALLEGATIONS OF PROXIMATE CAUSE

199.   Plaintiffs incorporate herein, as if fully set forth, the allegations of paragraphs 1-198.

200.   As a direct and proximate result of the wrongful conduct of Defendants, as alleged herein, Scott was killed.

## XIII.   ALLEGATIONS OF DAMAGES

201.   Plaintiffs incorporate herein, as if fully set forth, the allegations of paragraphs 1-200.

202.   As a direct and proximate result of the wrongful conduct of Defendants, as alleged herein, Plaintiffs Adam Norberg and Cody Norberg, the surviving sons of Scott, have been deprived of their

37

constitutionally protected right to the continued companionship and society of their father, and have suffered present and future economic damages in loss of support and income.

203. As a direct and proximate result of the wrongful conduct of Defendants, as alleged herein, Plaintiffs Jaron and Deena Norberg, as the surviving parents of Scott, have been deprived of their constitutionally protected right to the continued companionship and society of their son.

204. As a direct and proximate result of the wrongful conduct of Defendants, as alleged herein, Plaintiffs Adam, Cody, Jaron and Deena Norberg have been deprived of their right to redress for Scott's beating and killing and have suffered a reduction in the value of their claims against Defendants.

205. As a direct and proximate result of the wrongful conduct of Defendants, as alleged herein, the Estate of Scott J. Norberg has suffered damages in the form of pre-death pain and suffering, loss of life, expected earnings and economic damages.

206. As a direct and proximate result of the wrongful conduct of Defendants, as alleged herein, all Plaintiffs have suffered and will continue in the future to suffer a loss of love, affection, companionship, care, protection, and guidance, and have suffered and will continue in the future to suffer pain, grief, sorrow, anguish, stress, shock, and mental suffering.

207. Pursuant to the provisions of 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees as to the causes of action alleged under the Constitution and laws of the United States.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.      general damages against all Defendants in the amount of $20,000,000;

B.      punitive damages in an amount deemed just and reasonable against the individual Defendants as to the causes of action alleged herein;

38

C.    attorneys' fees against all Defendants as to the causes of action alleged under the Constitution and laws of the United States;

D.    costs of litigation; and

E.    such other and further relief which to the Court may seem just and reasonable under the circumstances.

RESPECTFULLY SUBMITTED this *24th* day of September, 1998.

**MORRISON & HECKER** L.L.P.

By: _____

Michael C. Manning
William P. French
Christopher J. Berry
2800 North Central Avenue, Suite 1600
Phoenix, Arizona 85004-1047
  Attorneys for Plaintiffs

ORIGINAL of the foregoing filed
this *24th* day of September, 1998, with:

Clerk of the District Court
230 North First Avenue
Phoenix, Arizona  85025

COPY of the forgoing mailed
this *24th* day of September 1998 to:

Paul F. Lazarus, Esq.
**PAUL F. LAZARUS, P.C.**
3636 North Central Avenue
Suite 790
Phoenix, AZ 85012

Michael J. Frazelle, Esq.
**RIDENOUR, SWENSEN, CLEERE**
  **& EVANS**
Two Renaissance Square
40 North Central Avenue
Suite 1400
Phoenix, AZ 85004-2397

Robert S. Cronin, Jr., Esq.
**CRONIN & STANEWICH**
3636 North Central Avenue
Suite 560
Phoenix, AZ 85012-1934

Paul Holloway, Esq.
**HOLLOWAY ODEGARD & SWEENEY, P.C.**
3101 N. Central Avenue
Suite 1200
Phoenix, AZ 85012

::ODMA\PCDOCS\PHXDOCS\52048\1